IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RONALD E. CHINITZ, individually, and on behalf of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>ALLY BANK, and DOES 1-50,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**<br><br>Case No. 2:19-cv-00059<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

This putative class action concerns a dispute about the way Defendant Ally Bank pays interest on funds transferred to Ally's customers' accounts via standard ACH transfer. Specifically, Plaintiff Ronald E. Chinitz alleges Ally wrongfully fails to pay interest on funds it receives via ACH transfer beginning on the day Ally receives those funds. Ally filed a Motion to Dismiss, arguing Chinitz's Second Amended Complaint fails to state a claim upon which relief can be granted. For the reasons explained below, Ally's Motion is GRANTED.

## BACKGROUND[1]

Ally is an internet-only bank that allows customers to transfer money in and out of their Ally accounts using the Automated Clearing House (ACH) Network.[2] The ACH Network is used to transfer money and information from one bank account to another.[3]

---

[1] Because this case is before the court on a motion to dismiss, the court accepts as true all well-pled factual allegations contained in the Second Amended Complaint. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] Dkt. 67 ¶¶ 1–2.

[3] Dkt. 67 ¶ 2.

1

Chinitz opened an interest-bearing online savings account with Ally in July 2017.[4] Chinitz's online savings account is subject to Ally's Deposit Agreement and Disclosures (the DAD).[5] Relevant to this Motion are the DAD's provisions regarding ACH transfers and interest.[6]

Section I.B.4 of the DAD governs interest and is titled "How Interest is Calculated."[7] It states in relevant part: "Interest will be compounded on a daily basis. We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal and interest that has been accrued to the account each day."[8]

Section I.D.4.b deals with ACH transfers and is titled "External ACH Transfers Initiated at Ally by You; Non-Ally Accounts."[9] This Section, in part, sets out "the timing of when funds are debited and credited based on the day and time the Standard [ACH] Transfer request is received by Ally."[10] The DAD provides a chart illustrating the timing of when funds are debited and credited to Ally accounts. The DAD explains funds will be delivered to customer accounts on the third business day after a standard transfer request is initiated.[11] By way of example, the DAD provides that, if a request for standard ACH transfer from an external account to an Ally account is submitted between 1:01 a.m. ET Monday and 1:00 a.m. ET Tuesday, the funds will be

---

[4] Dkt. 67 ¶ 15.

[5] Dkt. 67 ¶ 7.

[6] "In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits . . . ." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.). Here, the DAD is attached as an exhibit to Chinitz's Second Amended Complaint. Accordingly, the court may consider the DAD without converting Ally's Motion into a motion for summary judgment.

[7] Dkt. 67, Ex. A at 4.

[8] Dkt. 67, Ex. A at 4.

[9] Dkt. 67, Ex. A at 18.

[10] Dkt. 67, Ex. A at 18.

[11] Dkt. 67, Ex. A at 18.

withdrawn from the external account on Tuesday and delivered to the Ally account on Thursday.[12] If a request is submitted after 1:01 a.m. ET on Tuesday, the funds will be withdrawn on Wednesday and delivered on Friday.[13]

And finally, Section I.D.4.d, which also deals with ACH transfers, is titled "Availability of Funds" and provides in relevant part, "For Inbound Transfers originated at Ally, the funds are generally available in your Ally account when they are received."[14]

On July 18, 2017, Chinitz initiated a standard ACH transfer from his external account to his Ally account in the amount of $800.[15] Ally withdrew the $800 from Chinitz's external account on July 19.[16] Ally received the funds no later than July 20, but did not deliver Chinitz's $800 deposit to his account or start paying interest on the deposit until July 21.[17]

Chinitz initiated another standard ACH transfer on August 18, 2017, directing Ally to deposit $1,000 into his online savings account from an external account.[18] Ally withdrew the sum from Chinitz's external account on August 21.[19] Ally received the funds no later than August 22, but did not deliver the funds to Chinitz's account or start paying interest until August 23.[20]

---

[12] Dkt. 67, Ex. A at 18.
[13] Dkt. 67, Ex. A at 18.
[14] Dkt. 67, Ex. A at 20.
[15] Dkt. 67 ¶ 15.
[16] Dkt. 67 ¶ 15.
[17] Dkt. 67 ¶ 15.
[18] Dkt. 67 ¶ 16.
[19] Dkt. 67 ¶ 16.
[20] Dkt. 67 ¶ 16.

Believing Ally improperly withheld his interest payments, Chinitz filed a Complaint in United States District Court for the Northern District of California on behalf of himself and a putative class.[21] At Ally's request, the Northern District of California transferred the case to Utah.[22]

This court previously dismissed Chinitz's First Amended Complaint on May 7, 2019.[23] On June 21, 2019, Chinitz filed his Second Amended Complaint (SAC).[24] And on July 18, 2019, Ally filed a Motion to Dismiss.[25] The Motion is now fully briefed and ready for consideration.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."[26] Under Rule 12(b)(6), a court must dismiss causes of action that "fail[ ] to state a claim upon which relief can be granted."[27] To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[28] A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[29] When evaluating a motion to dismiss, the court "accept[s] all well-pleaded facts [in the complaint] as true and

---

[21] Dkt. 1.

[22] Dkt. 24.

[23] Dkt. 64.

[24] Dkt. 67.

[25] Dkt. 72.

[26] Fed. R. Civ. P. 8(a)(2).

[27] Fed. R. Civ. P. 12(b)(6).

[28] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

[29] *Id.*

4

view[s] them in the light most favorable to the plaintiff."[30] However, the court will not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[31] The reviewing court is required to "draw on its judicial experience and common sense" to evaluate whether the well-pled facts state a plausible claim for relief.[32] "Though a complaint need not provide detailed factual allegations, it must give just enough factual detail to provide [defendants] fair notice of what the . . . claim is and the grounds upon which it rests."[33]

## ANALYSIS

Chinitz brings three causes of action against Ally: (1) conversion; (2) fraud; and (3) unjust enrichment. The court will address each in turn.

### I. CONVERSION

Chinitz's first cause of action is one for conversion. Specifically, Chinitz alleges "Ally willfully and intentionally interfered with Plaintiff's and the Class Members' right to have interest accrue on money transferred to their Ally accounts via standard ACH transfers starting from the day Ally received that money from external financial institutions."[34]

#### A. Failure to State A Claim

Under Utah law, "a conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and

---

[30] *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011) (citation omitted).

[31] *Iqbal*, 556 U.S. at 678.

[32] *Id.* at 679.

[33] *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).

[34] Dkt. 67 ¶ 33.

5

possession."[35] A chattel is tangible property.[36] As Utah courts have explained, "[m]oney may be the subject of conversion when the party charged wrongfully received it" or when "misappropriated funds [have been] placed in the custody of another for a definite application."[37]

Ally first argues Chinitz's conversion claim fails because Chinitz alleges conversion of intangible property: the right to have interest accrue on money transferred to Ally.[38] Chinitz responds that his claim is better characterized not as conversion of a right to have interest accrue, but rather conversion of interest that should have been paid to Chinitz by never making that interest available to Chinitz.[39] In other words, Chinitz characterizes his conversion claim as a claim for non-payment of interest owed to Chinitz. This dispute need not be resolved, however, because, even if the court accepts Chinitz's characterization of his conversion claim, such a claim is not cognizable under Utah law.

The SAC does not contain any allegations suggesting Ally "wrongfully received" any money as a result of Chinitz's transactions with Ally. The SAC does not allege Ally's receipt of Chinitz's inbound transfer was wrongful. Instead, the SAC alleges non-payment of agreed-upon interest forms the basis for the conversion claim.[40] But the non-payment of agreed-upon interest cannot alone form the basis for a conversion claim under a wrongful receipt theory because the

---

[35] *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958).

[36] *See Kirkham v. Widdison*, 447 P.3d 89, 97 (Utah Ct. App. 2019) ("Kirkham urges us to expand the definition of a chattel to apply to intangible property. We decline to do so.").

[37] *State v. Twitchell*, 832 P.2d 866, 870 (Utah Ct. App. 1992) (citation omitted) (internal quotation marks omitted).

[38] Dkt. 72 at 13.

[39] Dkt. 76 at 6.

[40] Dkt. 67 ¶ 33.

6

SAC does not allege any underlying wrongful receipt of money. Rather, the SAC alleges a general debt owed to Chinitz by Ally in the form of unpaid agreed-upon interest.[41]

Nor does the SAC allege a misappropriation of funds placed in the custody of another for a definite application. The SAC does not allege Ally misused the funds Chinitz transferred to his Ally account.[42] This stands in stark contrast to cases in which courts have sustained conversion claims when a plaintiff placed funds in the custody of another for a particular use, and then that person misused those funds.[43] Instead, the SAC, at its core, alleges Ally failed to confer a promised benefit on Chinitz. Specifically, Chinitz transferred funds to Ally with the expectation that Ally would hold those funds and begin to pay interest on them when it received those funds but, upon receipt of the funds, Ally failed to uphold the promise to pay interest—at least for one day. Thus, the alleged wrongdoing is not that Ally misappropriated the funds Chinitz transferred to Ally, but rather that Ally failed to uphold an ancillary contractual promise—the payment of interest—related to the transfer of funds.

In sum, the court concludes the SAC fails to state a claim for conversion under Utah law because the SAC alleges neither wrongful receipt of money by Ally nor misappropriation of funds transferred to Ally.

---

[41] The money that is the subject of this dispute—the unpaid day's worth of interest—was not wrongfully received by Ally. Indeed, the SAC does not allege Ally received any interest to which Chinitz was directly entitled. In his Opposition, Chinitz states "Plaintiff has essentially claimed that Ally has *received and retained interest from Plaintiff* for Ally's benefit." Dkt. 76 at 13. But the allegations in the SAC belie such an assertion. Ally did not receive *interest* from Chinitz. Instead, Ally received a transfer of funds from Chinitz. Dkt. 67 ¶¶ 15–16. And Ally had agreed to compensate Chinitz for that transfer by paying Chinitz interest on that transfer. In this sense, any interest owed to Chinitz by Ally is best understood as a contractual debt.

[42] As explained above, *see supra note* 41, the funds Chinitz placed in Ally's custody are the funds he deposited to his Ally account via standard ACH transfer. And as Chinitz explains in his Opposition, "Plaintiff here is not alleging that Ally wrongfully withdrew any funds from his account." Dkt. 76 at 8.

[43] *See*, *e.g.*, *Twitchell*, 832 P.2d at 870 (insurance broker retaining client's insurance premium payments in his own accounts rather than forwarding premiums to insurance companies formed basis of conversion claim); *Didericksen v. Cyprus Credit Union*, No. 2:10-cv-211, 2013 WL 6056598, at *6 (D. Utah Nov. 15, 2013) (credit union freezing funds in customer's bank account without legal justification formed basis of conversion claim).

B. Economic Loss Rule

Additionally, Ally also argues Chinitz's conversion claim is barred by the economic loss rule. The court agrees.

The economic loss rule marks the fundamental boundary between contract law and tort law.[44] Generally speaking, the economic loss rule prevents the recovery of purely economic damages under a tort theory "when a contract covers the subject matter of the dispute."[45] Therefore, "when a conflict arises between parties to a contract regarding the subject matter of that contract, 'the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon.'"[46]

The application of the economic loss rule depends on "whether a duty exists independent of any contractual obligations between the parties."[47] "[O]nce there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract."[48] In contrast, all contractual duties—and any breach of those duties—must be enforced through contract law.[49] If, however, an independent duty exists that does not overlap with a contractual duty, the economic loss rule does not bar a party from bringing a tort claim based on that independent duty.[50]

Ally argues Chinitz's conversion claim is barred by the economic loss rule because it is based on the DAD's contractual duty to pay interest.[51] Chinitz responds that the DAD does not

---

[44] *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012).

[45] *Id.*; *see also HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 197 (extending *Reighard*'s rationale to the intentional tort context).

[46] *Id.* (citation omitted).

[47] *Id.* (citation omitted).

[48] *Id.* (citation omitted).

[49] *Id.*

[50] *Id.*

[51] Dkt. 72 at 19.

cover the subject matter of this dispute—Ally's use of funds prior to posting them to customer accounts—and therefore the economic loss rule is inapplicable here.[52]

As an initial matter, the court disagrees with Chinitz's characterization of the subject matter of the dispute. The subject matter of this dispute is not what Ally can do with the funds it receives prior to posting them to customer accounts, but rather Ally's non-payment of interest for its use of those funds. Chinitz's own characterization of his conversion claim confirms as much. In his Opposition, Chinitz states he is alleging "Ally stole interest belonging to Plaintiff and the class by never making the interest available in their accounts in the first place."[53] In other words, Chinitz takes issue not with how Ally used any funds, but instead with Ally's failure to compensate him for the use of those funds by paying interest on them.

Having established the subject matter of this dispute is the non-payment of interest, it becomes clear the economic loss rule bars Chinitz's conversion claim. Ally's duty to pay interest on transferred funds is born entirely out of the DAD. And the DAD unambiguously addresses the terms on which Ally agrees to pay interest on transferred funds. That is, the DAD clearly states Ally will begin to pay interest on the third business day after the customer initiates an inbound standard ACH transfer. Therefore, the DAD covers the subject matter of this dispute—non-payment of interest—and the economic loss rule applies.

To avoid application of the economic loss rule, Chinitz would have to show that Ally has an independent duty to begin paying interest on the funds it receives as soon as it receives them. But he has not done so.

---

[52] Dkt. 76 at 19.
[53] Dkt. 76 at 14.

To be sure, section 4306(c) of the Truth in Savings Act (TISA) requires that interest on an interest-bearing account—in this case, Chinitz's online savings account with Ally—must accrue from the day the depository institution—in this case, Ally—receives transferred funds.[54] Section 4306(c), however, does not establish any independent duty for purposes of avoiding the economic loss rule.

The Utah Supreme Court's opinion in *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing*[55] is instructive on this issue. In *Davencourt*, a homeowners association sued a builder and developer, seeking recovery of damages for improperly constructed homes.[56] In addition to a number of contract claims, the association also brought tort claims for negligence, negligent misrepresentation, negligence per se, and nuisance.[57] Citing the economic loss rule, the district court dismissed the tort claims, concluding the real estate purchase contract between the developer and association covered the subject matter of the dispute.[58]

On appeal, the Utah Supreme Court was tasked with determining whether any independent duty existed that would take the association's tort claims outside the scope of the economic loss rule. Relevant here, the association argued there was an independent duty to build in conformity with the state's building code.[59] The Court disagreed, holding the building code does not "create an independent legal duty for purposes of avoiding the economic loss rule."[60]

---

[54] 12 U.S.C. § 4306(c).

[55] 221 P.3d 234 (Utah 2009).

[56] *See id.* at 240–41.

[57] *Id.* at 241.

[58] *Id.*

[59] *Id.* at 247.

[60] *Id.* at 248.

The Court explained that, "[a]lthough [the statute] creates a statutory basis for compliance with building codes, it does not by itself create the duty argued for by the Association."[61] The Court noted that "the statute exists to promote safety, rather than aid in the recovery of damages," before concluding, "[i]f a statutory duty is to exist that lies outside the scope of the economic loss rule, we leave it to the decision of the legislature, as has been done in other states."[62] In other words, Utah courts will not recognize an independent statutory duty unless the legislature creates an independent statutory duty by creating a private right of action for violations of the statute.

Here, TISA does not provide a private right of action for violations of the statute. Instead, enforcement of TISA is left to administrative agencies.[63] Therefore, the court concludes that, under Utah law, TISA does not create an independent duty to pay interest on the day funds are received for purposes of avoiding the economic loss rule. Accordingly, Chinitz's conversion claim is barred by the economic loss rule.

## II. FRAUD

Chinitz's next cause of action is one for fraud. Specifically, Chinitz alleges Section I.D.4.d of the DAD, which states "For Inbound Transfers originated at Ally, the funds are generally available in your Ally account when they are received," is a false disclosure that Ally

---

[61] *Id.*

[62] *Id.* In support of this conclusion, the Court cited to *Comptech International, Inc. v. Milam Commerce Park, Ltd.*, 753 So. 2d 1219, 1221–23 (Fla. 1999), in which the Florida Supreme Court held the economic loss rule did not bar a tort action where the state's building code provided for a private right of action for injuries caused by violations of the building code.

[63] *See* 12 U.S.C. § 4309.

made for the purpose of inducing Chinitz to open and maintain an online savings account with Ally.[64]

To prevail on a claim of fraud under Utah law, a party must establish the following elements by clear and convincing evidence:

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representer either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.[65]

Additionally, Rule 9(b) provides in relevant part, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[66] This means a complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[67]

Ally argues the SAC fails to adequately establish the elements of materiality, actual reliance, and damages.[68] The court concludes the SAC establishes—if just—the elements of materiality and damages but does not contain sufficient factual allegations to establish the element of actual reliance.

With respect to materiality, a fact is material "only if it is 'significant or essential to the issue or matter at hand.'"[69] Ally argues Chinitz has failed to satisfy this element because "[w]hen Ally receives funds is not a material fact" and "[w]hat is important to a depositor is

---

[64] Dkt. 67 ¶ 46.

[65] *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986).

[66] Fed. R. Civ. P. 9(b).

[67] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

[68] Dkt. 72 at 9–10.

[69] *In re A.T.I.G.*, 293 P.3d 276, 287 (Utah 2012) (citation omitted).

when Ally will credit funds from an inbound transfer to his or her account and begin paying interest on those funds."[70] As an initial matter, the court understands the thrust of Chinitz's fraud claim to be that Section I.D.4.d of the DAD—when read in conjunction with Section I.B.4—creates the false impression that Ally will credit funds and begin paying interest on those funds as soon as it receives them. In other words, the alleged misrepresentation contained in Section I.D.4.d bears directly on the issue Ally posits is important to its depositors. But in any event, the court concludes materiality here is a question reserved for the trier of fact and is therefore not properly resolved by the court on a Rule 12(b)(6) motion. As Utah courts have held in a number of other contexts, materiality is "generally a question of fact for the fact finder."[71] The court sees no reason to stray from this general proposition in this case. Whether it is "significant or essential" to Chinitz and other depositors when Ally makes funds available—and, by extension, when Ally begins to pay interest—is a question best suited for a trier of fact, and thus the court declines to dismiss Chinitz's fraud claim on the ground Ally advances.[72]

---

[70] Dkt. 72 at 16. In this sense, Ally's argument is not directed at the sufficiency with which Chinitz has pleaded materiality. Instead, Ally argues the alleged misrepresentation here could never be considered material.

[71] *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 458 (Utah Ct. App. 1994) ("Whether a party has materially breached a lease is generally a question of fact for the fact finder."); *see also State v. Larsen*, 865 P.2d 1355, 1363 (Utah 1993) ("The bottom line is that the question of materiality as it relates to the importance or significance of the omitted information [in a securities fraud case] is, at least on one level, a factual issue to be determined by the jury."); *Coalville City v. Lundgren*, 930 P.2d 1206, 1209 (Utah Ct. App. 1997) ("What constitutes a material breach [of contract] is a question of fact.").

[72] This is not to say the court could never decide the question of materiality as a matter of law. For example, if the court were to conclude that reasonable minds could not differ on whether a misrepresentation was material, then it may become appropriate for the court to decide materiality as a matter of law. *Cf. Christensen v. Swenson*, 874 P.2d 125, 127 (Utah 1994) ("Whether an employee is acting within the scope of her employment is ordinarily a question of fact. The question must be submitted to the jury . . . . However, when the employee's activity is so clearly within or outside the scope of employment that reasonable minds cannot differ, the court may decide the issue as a matter of law.") (citation omitted) (internal quotation marks omitted). Here, however, the court cannot conclude the alleged misrepresentation in Section I.D.4.d is such that reasonable minds could not differ on whether it would be material to Chinitz and others in his position.

With respect to damages, Ally argues Chinitz does not adequately allege how he was harmed by his reliance on the alleged misrepresentation.[73] The court disagrees. The SAC adequately alleges injury resulting from Ally's alleged misrepresentation. Specifically, Chinitz alleges he initiated transfers to his Ally account, but Ally held those funds for at least one day without paying Chinitz any interest for the use of those funds.[74] Thus, Chinitz adequately alleges he was injured by Ally's failure to pay interest on his transferred funds beginning when Ally received those funds.

With respect to reliance, however, the SAC falls short. As noted above, Rule 9(b) requires a complaint in a fraud case to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and *the consequences thereof*."[75] And as the Tenth Circuit has explained, one "consequence" that must be pleaded with particularity is the plaintiff's reliance.[76] Here, the SAC fails to allege with particularity that Chinitz actually relied on Ally's alleged misrepresentation. The SAC's lone allegation relating to actual reliance states, "Plaintiff and the Class Members relied on Ally's misrepresentation to their detriment, as evidenced by them opening and maintaining their Ally accounts and initiating standard ACH transfers into their Ally accounts."[77] This is insufficient to demonstrate actual reliance. The fact Chinitz opened an Ally account and initiated transfers into that account does not demonstrate that Chinitz in fact relied on Ally's alleged misrepresentation in doing so.

---

[73] Dkt. 72 at 17.

[74] *See* dkt. 67 ¶¶ 4, 6, 45–46.

[75] *Koch*, 203 F.3d at 1236 (emphasis).

[76] *See Parrish v. Arvest Bank*, 717 F. App'x 756, 761–62 (10th Cir. 2017) (unpublished) (explaining that plaintiff's "broad allegations regarding her reliance" were insufficient to satisfy Rule 9(b)'s requirement that a plaintiff "must allege with particularity the 'consequences' of [defendant's] false statements").

[77] Dkt. 67 ¶ 46.

Indeed, there is any number of reasons why Chinitz might have opened his Ally account and initiated transfers into that account. Perhaps Chinitz did so because he sought the convenience of an online bank account that he could access from anywhere. Or perhaps Chinitz had heard good things about Ally from his friends and that is what motivated his decisionmaking. Put simply, the SAC fails to allege any causal link between Ally's alleged misrepresentation and the actions Chinitz took. Therefore, Chinitz has failed to adequately allege that he took any action in actual reliance on Ally's alleged misrepresentation. Accordingly, Chinitz's fraud claim fails under Utah law.[78]

### III. UNJUST ENRICHMENT

Chinitz's third and final claim is one for unjust enrichment. Specifically, Chinitz alleges he conferred a benefit upon Ally when he transferred funds to Ally and Ally enjoyed the use of those funds without payment of interest for one day, and that it would be unjust for Ally to retain this benefit without paying Chinitz the value of the one day of interest.[79]

---

[78] Ally also argues Chinitz's fraud claim is barred by the economic loss rule. As an initial matter, the Utah Supreme Court made clear in *Healthbanc International, LLC v. Synergy Worldwide, Inc.*, that the economic loss rule bars a fraud claim "that overlaps completely with a contract claim." 435 P.3d 193, 198 (Utah 2018). In other words, the economic loss rule applies when the alleged fraud "is also a breach of a warranty in the contract." *Id.* at 196. Thus, to the extent Chinitz argues Section I.D.4.d is a warranty, that claim is barred by the economic loss rule.

On the other hand, the Utah Supreme Court has not addressed the broader question of whether an exception to the economic loss rule exists for fraud claims in which the alleged fraud does not also constitute a breach of a warranty in the contract. *See id.* at 194 ("We stop short, however, of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule in Utah. We defer that question to a future case in which the facts may warrant it."). Thus, to the extent Chinitz argues Section I.D.4.d is simply a representation or disclosure, it is not so clear the economic loss rule would bar his fraud claim. Because no breach of contract claim would lie for false representation or disclosure—as opposed to breach of a warranty—*Healthbanc* would not itself foreclose such a fraud claim. *See id.* at 196 ("In cases like this one, where the party's tort claim is a mere duplication of its breach of contract claim, there is no exception to the economic loss rule. The tort claim is barred. [But] [w]e do not foreclose the possibility that in a future case a limited exception for fraud in the inducement may be warranted."). Whether such a claim is viable under Utah law, then, appears to be an unanswered question.

In any event, resolution of this unsettled question is unnecessary here because Chinitz's fraud claim—as currently pleaded—fails on the merits.

[79] Dkt. 76 ¶¶ 38–41.

To establish a claim for unjust enrichment under Utah law, a plaintiff must show: "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[80] Additionally, as the Utah Supreme Court has explained, unjust enrichment is designed to provide an equitable remedy when one does not exist at law, and therefore when "'an express contract covering the subject matter of the litigation' exists, recovery for unjust enrichment is not available."[81]

As a threshold matter, the parties disagree about: (1) what the subject matter of the litigation is, and (2) whether there is an express contract covering the subject matter of this litigation.

With respect to the subject matter of the litigation, Chinitz would prefer to characterize the subject matter of his unjust enrichment claim as what Ally can do with funds received from standard ACH transfers in the one day (or more) prior to posting those deposits to customer accounts.[82] Ally, on the other hand, believes the subject matter of Chinitz's unjust enrichment is Ally's non-payment of interest for the one day (or more) prior to posting deposits to customer accounts.[83] The court agrees with Ally.

The SAC does not allege unjust enrichment based on Ally's *use* of deposited funds, but rather Ally's *failure to pay interest* on those funds beginning on the day Ally receives those funds. Indeed, as the SAC alleges, "Ally unjustly retained a benefit conferred by Plaintiff and

---

[80] *Rawlings v. Rawlings*, 240 P.3d 754, 763 (Utah 2010) (citation omitted).

[81] *Selvig v. Blockbuster Enters., LC*, 266 P.3d 691, 698 (Utah 2011).

[82] *See* dkt. 76 at 24.

[83] *See* dkt. 78 at 11.

the Class Members when Ally obtained via standard ACH transfer the exclusive use and possession of Plaintiff and the Class Members' funds *interest-free for one day or more* prior to Ally posting those funds to its customers' accounts and beginning to accrue interest on those funds."[84] In contrast, if Ally had begun paying interest on those funds as soon as it received them, there would be no benefit unjustly retained by Ally. Therefore, the lynchpin of Chinitz's unjust enrichment claim—and the subject matter of this litigation—is Ally's non-payment of interest.

With that understanding in mind, the court now turns to whether there is an express contract covering the subject matter of the litigation. As Ally correctly points out, the DAD expressly covers how and when Ally will pay interest on deposited funds. To avoid this reality, Chinitz asserts in the SAC that "[i]f any term in the DAD is construed to permit Ally to delay paying interest on funds it receives from standard ACH deposits by one day or more after Ally receives such funds, that construction violates [TISA] and is therefore illegal and unenforceable; such a term would also be unenforceable on grounds of public policy."[85] In other words, Chinitz asserts the DAD does not cover the subject matter of this litigation—non-payment of interest—because any provisions in the DAD allowing Ally to delay payment of interest are unenforceable. But Chinitz fails to adequately explain why this is the case.[86]

---

[84] Dkt. 76 ¶ 38 (emphasis added).

[85] Dkt. 76 ¶ 37.

[86] Ally does not directly contest whether any portions of the contract are unenforceable. Instead, Ally contends the DAD survives any unenforceable provisions because it contains a severability clause. *See* dkt. 72 at 18–19. But before the court can consider any potential effect of severability, the court must be satisfied that, as a matter of law, portions of the DAD could be unenforceable under Utah law.

Utah courts adhere to the general rule that "the law favors the right of men of full age and competent understanding to contract freely."[87] Therefore, "[p]eople are generally free to bind themselves pursuant to any contract, barring such things as illegality of subject matter or legal incapacity."[88] And, under Utah law, "an enforceable contract can coexist with a statute that may conflict with its terms so long as the contract does not offend the public policy to which the statute gives voice."[89] Or put slightly differently, "a contract is not automatically unenforceable 'merely [because it is] in violation of statute.'"[90]

In *Ockey*, the Utah Supreme Court explained that, "[f]or a contract to be void on the basis of public policy, 'there must be a showing free from doubt that the contract is against public policy.'"[91] In determining whether such a showing has been made, Utah courts look primarily to two factors: (1) "whether the statute specifically declare[s] contrary contracts to be void" and (2) "whether the contract offend[s] public policy or harm[s] the public as a whole, as opposed to the contracting party only."[92]

Here, Chinitz fails to clear the initial hurdle of establishing certain provisions of the DAD could be unenforceable under Utah law.[93] The SAC states in conclusory fashion that certain provisions of the DAD are "illegal and unenforceable" and "unenforceable on grounds of public

---

[87] *Ockey v. Lehmer*, 189 P.3d 51, 57 (Utah 2008) (citation omitted).

[88] *Phone Directories Co. v. Henderson*, 8 P.3d 256, 261 (Utah 2000).

[89] *Lee v. Thorpe*, 147 P.3d 443, 447 (Utah 2006).

[90] *Peterson v. Sunrider Corp.*, 48 P.3d 918, 931 (Utah 2002).

[91] 189 P.3d at 57.

[92] *Howick v. Salt Lake City Corp.*, 310 P.3d 1220, 1228 (Utah Ct. App. 2013).

[93] While the Utah Supreme Court has never spoken on who carries the burden, *see Howick v. Salt Lake City Corp.*, 424 P.3d 841, 844 ("[W]e have not addressed who bears the burden of making 'a showing free from doubt that the contract is against public policy.'"), the Utah Court of Appeals has—in practice, at least—placed the burden on the party seeking to void the contract as against public policy, *see Howick*, 310 P.3d at 1229 ("We can hardly agree that Howick [(the party seeking to void the contract)] has made a 'showing free from doubt that the contract is against public policy.'").

policy."[94] But legal conclusions are not entitled to any weight or "assumption of truth" in a Rule 12(b)(6) analysis.[95] And the SAC does not allege facts from which the court could determine whether Chinitz's legal conclusions are correct under Utah law. In other words, the SAC contains no allegations related to the two-factor test Utah courts use to determine whether provisions of the DAD are unenforceable.[96] Nor does Chinitz expound upon this legal question in his SAC or Opposition. Therefore, the court is unable to apply the two-factor test to determine whether certain provisions of the DAD are unenforceable under Utah law. As a result, the court is left with nothing but conclusory allegations regarding the unenforceability of the DAD. And, "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."[97]

In the absence of sufficient factual allegations—and legal argument—to support Chinitz's assertion that provisions of the DAD relating to payment of interest are unenforceable, the court is left with an enforceable contract that expressly covers the subject matter of this litigation. Therefore, Chinitz's unjust enrichment claim must be dismissed.

---

[94] Dkt. 67 ¶ 37.

[95] *See Iqbal*, 556 U.S. at 680.

[96] The SAC, as a putative class action complaint, does allege harms to the class. But the question under Utah law is not whether these types of contracts create harm in the aggregate. The question is whether the contract at issue—that is, Chinitz's contract with Ally—creates widespread harm. By way of example, the Utah Supreme Court has found this factor satisfied in a contract between two parties that had the effect of fixing prices and limiting competition. *See Ockey*, 189 P.3d at 57 (explaining *Zion's Serv. Corp. v. Danielson*, 366 P.2d 982 (Utah 1961)). In that case, the effects of the contract—price fixing and limiting competition—could be felt by persons outside the parties to the contract. *See id.*

[97] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

## CONCLUSION

For the reasons stated above, Ally's Motion[98] is GRANTED. Chinitz's Second Amended Complaint[99] is hereby DISMISSED without prejudice. Chinitz has thirty (30) days from the date of this Order to file a Motion for Leave to File a Third Amended Complaint, should he wish to do so.

**SO ORDERED** this 7th day of April, 2020.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[98] Dkt. 72.

[99] Dkt. 67.